IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| v. | ) | 1:19-CR-16 |
| | ) | |
| BRAD EARL MOSLEY, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Catherine C. Eagles, District Judge.

The defendant, Brad Mosley, moves to suppress evidence against him based on a lack of reasonable suspicion or probable cause to stop his vehicle, detain him, or search his vehicle. Doc. 13. The Court heard evidence during two hearings, beginning on May 9, 2019, and concluding on May 17, 2019.

The sole valid justification for the stop was Mr. Mosley's violation of a noise ordinance, but officers did not diligently pursue that valid purpose, instead performing an unrelated drug investigation, including a dog sniff for narcotics. By the time the K-9 alert provided probable cause to search the vehicle, officers had unreasonably extended the duration of the stop, in violation of the Fourth Amendment. As such, the motion to suppress will be granted.

## **FINDINGS OF FACT**

In addition to the testimony at the hearings, the Court has weighed and considered the exhibits, including audio and video recordings and the written reports by law enforcement made at or near the time of the events. Having taken the matter under

advisement, and for purposes of resolving the motion to suppress, the Court makes the following findings of fact.

On June 6, 2018, the Winston-Salem Police Department and the Alcohol Law Enforcement branch of the North Carolina State Bureau of Investigation were conducting an ongoing joint investigation directed at identifying and gaining access to suspected illegal drink and drug houses in Winston-Salem.  To this end, ALE Agent Chris Kluttz and a confidential informant were working undercover at a shopping center on North Cherry Street, developing relationships in an attempt to gain access to drink or drug houses.  The CI has a long-term relationship with ALE, has worked with Agent Kluttz many times, is paid for his work, and has been found to be reliable on several occasions in ALE operations with different agents around the state.

In recent years, Winston-Salem police officers were often in the North Cherry Street area in connection with drug enforcement-related activity, to serve warrants, and in response to one homicide.  Agent Kluttz also reported suspicious drug and other criminal activity to Winston-Salem police officers as part of the operation, and on numerous previous occasions he had observed hand-to-hand drug transactions, open use of marijuana, and open carrying of weapons near and around the shopping center.

On June 6, Agent Kluttz wore a wire and ALE Agent K. Brandsema was able to listen to Agent Kluttz's conversations with the CI and others via that wire.  From time to time, Agent Kluttz also narrated events he was observing into the wire microphone so that Agent Brandsema knew what was happening on the ground.  These wire communications were recorded.  Agent Kluttz also had a cell phone he used to speak with

Agent Brandsema, who communicated with Winston-Salem police officers via a secure channel on another communication device. A camera installed on a nearby telephone pole provided video of the scene but no audio. Winston-Salem police officers were in the vicinity to assist and follow-up on any needed investigation.

The shopping center was small. It contained a convenience store and a barber shop, with a vacant storefront formerly housing a beauty salon in between the two. Agent Kluttz and the CI arrived around 2:30 p.m. and were drinking beer on the sidewalk, purportedly waiting on their boss to come pay them. They observed traffic in and out of the two businesses and engaged pedestrians and customers in conversations.

Agent Kluttz saw a red Camaro pull up in front of the shopping center. An unidentified black male in a black shirt and baseball cap (Person #1) came out of the barber shop and entered the Camaro, and the driver and Person #1 engaged in a quick hand-to-hand transaction. Agent Kluttz suspected this was a drug transaction, which he reported to Agent Brandsema. Winston-Salem police officers Hill and Thomas, who were part of the joint operation, stopped the Camaro and located drugs during a search.

A short time later, Person #1 was standing outside the barber shop and received a phone call. Agent Kluttz heard Person #1 say something to the effect that he was not leaving and that the other person could come to the barber shop to get "it." A short, stocky man (Person #2) arrived soon thereafter and interacted with Person #1, but he did not go into the barber shop. Agent Kluttz suspected that Person #2 was the person who had been on the phone with Person #1. Person #2 left.

3

By this point, Agent Kluttz had been on the scene for about two hours and had consumed two 24-ounce beers over this period. The CI consumed a similar amount of beer—at least 32 ounces and perhaps as much as a six-pack.

The defendant, Mr. Mosley, drove up in a blue Mazda and parked in front of the vacant shop. Agent Kluttz was across the street on his cell phone and Person #1 was standing outside the barbershop talking with another man, Person #5. Mr. Mosley got out of his car and Agent Kluttz crossed the street back towards the shopping center. There was no one else in the Mazda. Mr. Mosley went into the convenience store. There was nothing suspicious about Mr. Mosley's behavior or his actions and he did not seem to be looking for anyone.

While Mr. Mosley was in the convenience store, Agent Kluttz had a brief conversation with two women, Persons #3 and #4, standing on the sidewalk near the CI. Agent Kluttz and Person #4 followed Mr. Mosley into the store. The CI and Person #3 remained on the sidewalk. Person #5 went into the barber shop and Person #1 smoked a cigarette outside. Person #1 then went into the barbershop.

After being in the store for about a minute, Mr. Mosley left the store and walked over to and entered the barber shop, where he stayed for approximately one minute. When he came out, he greeted the CI in passing. Mr. Mosley took out a cigarette and then spoke with Person #3, who gave Mr. Mosley a lighter or a match. The CI walked over, standing somewhat near Mr. Mosley and Person #3 for approximately 15 seconds while Mr. Mosley lit a cigarette and returned the lighter to Person #3. Mr. Mosley walked a few feet towards his car and smoked the cigarette. The CI went into the

convenience store very briefly and then came back out.  Mr. Mosley got in his car, put on his seat belt, and drove off.  There was nothing visibly suspicious about Mr. Mosley's actions or behavior, and there were no hand-to-hand transactions other than the exchange of the cigarette lighter.

In the meantime, Agent Kluttz was told that the WSPD found drugs in the red Camaro.  When Agent Kluttz came out of the convenience store, Mr. Mosley was driving away.  The CI told Agent Kluttz that Mr. Mosley had offered "dope" to Person #3, which Agent Kluttz understood to be crack, and that the CI had asked Mr. Mosley for marijuana, but Mr. Mosley stated he did not have any.  Speaking into the microphone wire, Agent Kluttz confirmed that Agent Brandsema had heard the CI's information.

Sergeant T.S. Mabe learned, apparently from Agent Brandsema, that the driver of a blue Mazda went into the barber shop for a short period of time and that the driver was now leaving.  There is no evidence that anyone told Sergeant Mabe that the CI reported overhearing the driver offer crack to another pedestrian, and Sergeant Mabe's written report, Doc. 13-1 at 11–12, indicates he only knew that the driver went into the barbershop for a minute or two.  Sergeant Mabe repeated this information to Officer Hill.  Officer Hill characterized this as "illegal activity" and interpreted this as behavior that raised suspicions of drug activity.  He was not given any details about any suspicious behavior or drug activity and Officer Hill did not know that the driver had reportedly offered "dope" to someone outside the barber shop.  Sergeant Mabe asked Officer Hill to locate the vehicle.  Sergeant Mabe did not tell Officer Hill to stop or search the vehicle.

5

Within a few minutes, Officers Hill and Thomas located the blue Mazda. Officer Hill testified that it is a violation of Winston-Salem city ordinances to make noise audible from more than 50 feet away. The windows were down on the Mazda and, before the stop, Officer Hill could hear music from the vehicle when he was approximately 25 to 30 yards away.[1]

Officers Hill and Thomas stopped the Mazda to investigate possible drug activity. They based their decision on the fact that the driver of the red Camaro had been found with drugs shortly after leaving the same area as the Mazda, the fact that the area generally was known for drug activity, and the fact that the driver had gone into the barber shop for a short time. Officer Hill did not stop the vehicle based on, because of, or as a result of any potential noise violation or any other traffic law violation.[2] He stopped the Mazda to investigate drug activity.

The driver, subsequently identified as Mr. Mosley, stopped immediately in response to the blue light and siren. As Officer Hill approached the Mazda, he noticed that the driver was the sole occupant and was not wearing his seat belt. Officer Hill, who had not seen a seat belt violation before the stop, asked Mr. Mosley about his seat belt, and Mr. Mosley said he took it off after he stopped. Officer Hill then told Mr. Mosley

---

[1] While there is no audio on the segment of the body cam footage before the stop to corroborate Officer Hill's testimony, audio and video from the shopping center show that a few minutes before the stop, the Mazda's windows were down and music was playing loudly.

[2] Officer Hill's report, his conduct and that of other officers on the scene, the statements of officers on the scene to Mr. Mosley after they surrounded his car and placed him in handcuffs, and most of Officer Hill's testimony consistently establish that Mr. Mosley was stopped so law enforcement could investigate possible drug activity. Testimony and argument to contrary is a post-hoc rationalization.

that his music was too loud. Officer Hill told Mr. Mosley that he was stopping him for a noise violation, but this was not true; as reflected in Officer Hill's report, his statement was a subterfuge which he believed would make Mr. Mosley less likely to attempt to flee.

Officer Hill asked Mr. Mosley to produce his license and registration, which Mr. Mosley provided. Mr. Mosley was cooperative and while he spoke quickly, he did not appear to be unduly nervous.

Other Winston-Salem police officers, including Officer Abernathy with K-9 Bruce, arrived at the scene within seconds. It is standard practice to order occupants out of a car before a drug sniff,[3] and Officer Hill wanted Officer Abernathy to conduct a drug sniff outside the vehicle, so Officer Hill directed Mr. Mosley to get out of the car. He did not tell Mr. Mosley to get out of the car because of the purported noise violation or for any other reason than the drug sniff.

Mr. Mosley questioned why he had to get out of the car for a noise violation and Officer Thomas, who was at his passenger-side window, told him that it was for a narcotics investigation. After a brief discussion, Officer Hill took physical hold of Mr. Mosley and removed him from the car with assistance from another officer. Mr. Mosley did not resist or struggle, though he did not voluntarily get out of the car. Officer Hill moved Mr. Mosley a short distance away from the car and handcuffed him. Mr. Mosley continued to ask the officers what cause they had to detain him, and Officer Thomas again said it was for a narcotics investigation. He told Mr. Mosley that he was taken out

---

[3] Officer Hill conceded that this is not standard practice for addressing noise violations.

7

of the car so the K-9 could sniff the car for drugs and that, if the dog did not alert, he could be "on his way." The dog sniff began less than three minutes after Officer Hill first approached Mr. Mosley's car and was completed in approximately two and a half minutes.

During the dog sniff, another officer looked at the car tags on Mr. Mosley's license plate, which took seconds, and apparently learned that the vehicle's tag was expired. Officer Hill did not know the tag was expired before stopping Mr. Mosley or removing him from the car. If any officer checked the status of Mr. Mosley's driver's license or whether there were any warrants before or during the dog sniff, it is not part of the record.[4] Officer Hill did not cite Mr. Mosley for a seat belt violation or a noise violation or issue a warning ticket for either, and there is no evidence that he ever intended to do so. Mr. Mosley was stopped, detained, and removed from his car so that there could be a dog sniff around the vehicle. The dog sniff was not done while ordinary inquiries incident to a traffic stop were undertaken; to the extent any officer checked Mr. Mosley's tags, this was incidental to the dog sniff.

Officer Abernathy and K-9 Bruce had recently completed training and been certified to work together. While K-9 Bruce was a relatively new service dog, he had passed initial certification tests to detect scents of controlled substances in vehicles and he had proved to be reliable. Within moments of arriving on the scene, which was less than three minutes after officers stopped Mr. Mosley and only seconds after they

---

[4] The video shows one officer using a laptop computer, but there was no testimony from that officer and no witness testified as to what that officer was doing on the computer.

8

handcuffed him, Officer Abernathy and K-9 Bruce began an open-air sniff of the outside of the vehicle. K-9 Bruce alerted for controlled substances on the rear passenger side of the vehicle. Officer Abernathy also noticed that the front driver's side floor mat was folded up in an odd way. He had K-9 Bruce enter the vehicle, where he again alerted near the floor mat and the center console. Officer Abernathy folded back the floor mat and saw a firearm. Officer Abernathy relayed these results to Officer Hill, who then searched the car. In addition to the firearm, Officer Hill located controlled substances in the center console.

## **CONCLUSIONS OF LAW**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. When a police officer stops a vehicle, even briefly, it amounts to a seizure of the vehicle's occupants within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10 (1996);[5] *accord United States v. Arvizu*, 534 U.S. 266, 273 (2002) (noting the Fourth Amendment's protection against "unreasonable searches and seizures" extends to "brief investigatory stops" of vehicles). The defendant has the burden to show that his Fourth Amendment rights were violated by the challenged search or seizure. *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981).

The legality of a vehicle stop under the Fourth Amendment is governed by the two-part test set forth in *Terry v. Ohio*, 392 U.S. 1, 20 (1968). *See United States v.*

---

[5] The Court omits internal citations, alterations, and quotation marks throughout this opinion, unless otherwise noted. *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

9

*Sharpe*, 470 U.S. 675, 682–83 (1985). Under *Terry*, the first question is whether the stop was justified at its inception and the second is whether the "police officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011), *abrogated in part on other grounds by Rodriguez v. United States*, 135 S. Ct. 1609 (2015). Violation of either prong infringes the Fourth Amendment rights of the defendant. *Terry*, 392 U.S. at 16–20.

As to the first prong, the stop of a vehicle is lawful where officers have reasonable suspicion of criminal activity, *United States v. King*, 119 F.3d 290, 294 (4th Cir. 1997), or probable cause to believe that a traffic violation has occurred. *Whren*, 517 U.S. at 810. Here, Officers Hill and Thomas did not have reasonable suspicion to believe that the driver of the Mazda had committed a drug crime or engaged in other criminal activity. As far as Officers Hill and Thomas knew, the driver had done nothing more than briefly enter a business in a neighborhood with some history of drug activity and where a drug transaction had been observed about 30 minutes earlier. If this were enough, officers could stop and detain every person who entered such businesses to conduct a dog sniff around their persons or vehicles. That would be constitutionally unreasonable. *See, e.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (holding that a person's presence in an area of expected criminal activity is inadequate to support reasonable suspicion of criminal activity); *accord United States v. Sprinkle*, 106 F.3d 613, 617 (4th Cir. 1997).

Officers Hill and Thomas did not know that the CI had overheard Mr. Mosley offer to sell 'dope' to a third person, so this fact does not provide probable cause or reasonable suspicion. Nor did they stop Mr. Mosley based on an instruction or direction

10

from another officer who had probable cause or reasonable suspicion; as noted *supra*, Officers Hill and Thomas decided to stop the vehicle based on innocent behavior, i.e., that Mr. Mosley had been seen entering a barbershop where a drug transaction had occurred earlier in the day. While the collective-knowledge doctrine allows courts to substitute an instructing officer's knowledge of reasonable suspicion or probable cause for that of an acting officer who is told to effectuate a stop or arrest, *see United States v. Massenburg*, 654 F.3d 480, 493 (4th Cir. 2011), Officers Hill and Thomas were not instructed to stop or arrest Mr. Mosley; Sargent Mabe simply told Officer Hill to locate Mr. Mosley's vehicle. *See id.* at 492 ("The collective knowledge doctrine . . . holds that when an officer acts on an instruction from another officer, the act is justified if the instructing officer had sufficient information to justify taking such action herself; in this very limited sense, the instructing officer's knowledge is imputed to the acting officer."). The Court may not "aggregate bits and pieces of information from among myriad officers" to establish reasonable suspicion that Mr. Mosley committed a drug crime.[6] *Id.* at 493; *accord United States v. Patiutka*, 804 F.3d 684, 691 (4th Cir. 2015).

Nonetheless, the stop of the vehicle was not unconstitutional. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred," *Whren*, 517 U.S. at 810, such as the

---

[6] Because the CI's information was not passed on to Officers Hill or Thomas and it is not proper to impute that information to the acting officers or aggregate it with their knowledge, the Court need not decide whether the CI's report to Agent Kluttz was sufficient to constitute reasonable suspicion or probable cause, either by itself or in conjunction with Officer Hill's knowledge that another car whose driver had entered the barber shop 30 minutes earlier was later found to contain narcotics.

11

violation of a noise ordinance. *See, e.g.*, *United States v. Arias*, No. 09-CR-6126CJS, 2010 WL 2593933, at * 4 (W.D.N.Y. June 17, 2010). "Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008). This is true even if the offense is minor. *United States v. Williams*, 740 F.3d 308, 312 (4th Cir. 2014).

A Winston-Salem noise ordinance prohibits playing a car radio on a public road loud enough to be heard 50 feet from the vehicle and subjects violators to a fine. Winston-Salem, N.C., City Code ch. 46, art. I § 46-1, art. II § 46.36; *see also* Doc. 31-1 at 4, 9. Officer Hill testified without contradiction that he could hear music from Mr. Mosley's vehicle when he was approximately 25 to 30 yards away. While there is no audio segment of the body camera footage to corroborate this testimony, audio and video from the shopping center show that a few minutes before the stop, Mr. Mosley's windows were down and music was playing loudly. The evidence thus shows that Officer Hill had probable cause to believe that Mr. Mosley had violated the noise ordinance, and this personal observation of an infraction justified a stop of his vehicle.[7]

The fact that the officers' true motive – indeed, their only motive - for stopping the vehicle was to investigate drug crimes for which they had no reasonable suspicion does

---

[7] As noted *supra*, Officer Hill did not observe that Mr. Mosley was not wearing a seatbelt while Mr. Mosley was driving, and video evidence from the camera filming the shopping center suggests that he was. Nor was Officer Hill aware that Mr. Mosley's tags were expired until well after he initiated the stop. As such, neither provides a constitutional basis for the stop. *See United States v. Hernandez-Hernandez*, No. 3:18-cr-00009-GFVT, 2018 WL 6517437, at *2 (E.D. Ky. Dec. 11, 2018) ("[F]acts learned after the stop cannot support reasonable suspicion.").

not render the stop unlawful. A traffic stop is not "rendered invalid by the fact that it was a mere pretext for a narcotics search," so long as the officer who conducted the stop had probable cause to believe that the motorist had violated the traffic code, or, as here, a city noise ordinance. *Whren*, 517 U.S. at 810, 813; *see generally Ohio v. Robinette*, 519 U.S. 33, 38–39 (1996) (noting that reasonableness under the Fourth Amendment is evaluated objectively and officers' subjective intentions ordinarily play no role in the analysis). Because Officer Hill heard what he reasonably believed to be a noise violation, there was probable cause to stop the Mazda.

A stop that is justified at its inception may violate the Fourth Amendment if it is excessively intrusive in scope or duration. *Rodriguez*, 135 S. Ct. at 1614–15; *accord United States v. Jacobsen*, 466 U.S. 109, 124 (1984). The second prong of *Terry* mandates that the scope and duration of the stop be reasonably related to addressing the violation that justified the stop. *See Rodriguez*, 135 S. Ct. at 1614 ("[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' —to address the traffic violation that warranted the stop."); *accord United States v. Bernard*, -- F.3d --, 2019 WL 2571238, at *3 (4th Cir. June 24, 2019) (requiring court to evaluate whether the officer's actions after the stop "were reasonably related in the scope of circumstances that justified the stop.").

The mission of an officer who has stopped a motorist for a noise violation includes ordinary inquiries incident to the stop, *Illinois v. Caballes*, 543 U.S. 405, 408 (2005), such as checking the driver's license, determining whether to issue a ticket or if there are outstanding warrants against the driver, and inspecting the automobile's registration and

13

proof of insurance. *Rodriguez*, 135 S. Ct. at 1615. While diligently pursuing those purposes, "officers also may engage in other investigative techniques unrelated to the underlying traffic infraction," including using a K-9 to conduct a drug sniff outside a vehicle, but "only as long as that activity does not prolong the roadside detention for the traffic infraction." *United States v. Hill*, 852 F.3d 377, 382 (4th Cir. 2017).

When officers delay the diligent pursuit of the lawful purpose of a stop to investigate crimes unrelated to the basis for the stop, this necessarily and unreasonably prolongs the duration of the stop, in violation of the Fourth Amendment. *See Rodriguez*, 135 S. Ct. at 1616 ("The critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs'—i.e., adds time to—the stop"). If an unrelated investigation adds time to the stop, even a *de minimis* amount, *see United States v. Bowman*, 884 F.3d 200, 210 (4th Cir. 2018), it matters not whether the "overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances." *Rodriguez*, 135 S. Ct. at 1616. That is because an officer's diligence is gauged by "noting what the officer actually did and how he did it," not what he reasonably would have done. *Id.* To extend the detention of a motorist, officers must possess either reasonable suspicion of separate crimes or receive the driver's consent. *United States v. Williams*, 808 F.3d 238, 245–46 (4th Cir. 2015).

Here, the officers did not diligently pursue the purpose of the traffic stop: making inquiries, performing checks, or issuing citations related to the noise violation. Rather, the duration of the stop was dictated solely by the officers' investigation of drug activity. Though the traffic stop began in an ordinary way—Officer Hill asked for Mr. Mosley's

license and registration, which Mr. Mosley promptly provided—it did not proceed as an ordinary traffic stop; it proceeded as a drug investigation, consistent with the officers' actual reasons for stopping Mr. Mosley.

After collecting Mr. Mosley's license and registration at the beginning of the stop, Officers Hill and Thomas took no action to address the noise violation. Instead, they removed Mr. Mosley from the car[8] and stood by while Officer Abernathy conducted the K-9 sniff outside the vehicle. Officer Thomas told Mr. Mosley that the duration of the stop depended on whether the dog alerted to narcotics, and the officers' actions on the scene confirmed the accuracy of his statement. Before or during the sniff, there is no evidence that any officer ever began the process of issuing a citation for the noise violation, checked the status of Mr. Mosley's driver's license or for outstanding warrants, or took steps to verify Mr. Mosley's proof of insurance. *See, e.g.*, *Rodriguez*, 135 S. Ct. at 1615. The only evidence of action taken that could be considered part of an ordinary traffic stop was the act of one officer who physically looked at Mr. Mosley's vehicle tags on his license plate, but that took mere seconds during a dog sniff that lasted over two minutes. Although one officer used a laptop during the later stages of the dog sniff, there is no testimony indicating that the officer was using the computer to pursue inquiries related to the noise violation. Any efforts officers did take to address the noise violation

---

[8] The fact that Officer Hill ordered Mr. Mosley to get out of the car does not seem to raise constitutional concerns, even if it is not standard practice for enforcing noise ordinances. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.").

15

were collateral to the drug investigation, which directed their efforts and dictated the length of the stop.

While officers were justified in stopping Mr. Mosley for the noise violation, they could not then ignore the only valid basis for the stop and perform an unrelated drug investigation. By failing to pursue inquiries related to the noise violation with reasonable diligence while Officer Abernathy performed the dog sniff, officers unlawfully extended the stop without Mr. Mosley's consent or reasonable suspicion of separate crimes. *See Williams*, 808 F.3d at 245–46. By the time the K-9 alert provided probable cause of drug activity,[9] Mr. Mosley's constitutional rights against unreasonable searches had been violated. The fruits of that search must be suppressed.

## **CONCLUSION**

Officers Hill and Thomas did not have a reasonable suspicion to believe that Mr. Mosley had committed a drug crime or engaged in other criminal activity and could not constitutionally stop his vehicle based on his brief entrance into a commercial business near where drug activity often occurred. The officers were justified in stopping Mr. Mosley's vehicle for a noise violation, but their subsequent actions were not reasonably related in scope to the circumstances that justified the stop. Officers conducted a drug investigation upon stopping Mr. Mobley and did not diligently pursue inquiries related to a noise violation. By the time officers obtained probable cause to search the vehicle,

---

[9] The Court assumes that the alert of K-9 Bruce, who had proven reliable, provided probable cause for the presence narcotics. *See United States v. Jeffus*, 22 F.3d 554, 557 (4th Cir. 1994); *United States v. Dorsey*, No. 4:16–cr–00575, 2017 WL 624304, at *5 (D.S.C. Feb. 15, 2017).

16

their lack of diligence had unreasonably extended the stop, in violation of the Fourth Amendment.

It is **ORDERED** that the defendant's motion to suppress, Doc. 13, is **GRANTED**. This the 16th day of July, 2019.

_____
UNITED STATES DISTRICT JUDGE